## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |
|---|---|
| DAVID EASTMAN, and all others similarly situated, | ) ) ) |
|  | ) |
| Plaintiff, | ) |
| v. | ) |
|  | ) |
| TITEFLEX CORPORATION, | ) ) |
| Defendant. | ) ) |

Case No. 5:13-cv-00477

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, David Eastman, by and through undersigned counsel, brings this action on his own behalf and on behalf of a Class of persons defined below against Defendant Titeflex Corporation ("Defendant" or "Titeflex") and for his Complaint alleges, upon information and belief and based on the investigation to date of his counsel, as follows:

### NATURE OF THE ACTION

1.     This is a statewide class action brought by Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and on behalf of a Class of all similarly situated property owners, against Titeflex.  Titeflex manufactured, distributed, and supplied Gastite corrugated stainless steel tubing ("Gastite" or "CSST") throughout the United States, including Texas.

2.     CSST is an ultrathin, flexible piping used to transport natural gas within both residential and commercial structures.  It was developed as an alternative to the much thicker, more durable black iron pipe that has been used to transport gas within residential and commercial structures for more than a century.

3.     This action alleges that Titeflex improperly designed and manufactured Gastite and failed to properly test its resistance to lightning strikes.  Gastite's thin walls are susceptible to perforation by an electrical arc generated by a lightning strike, which can cause and has caused fires, damage to and detonation of residential structures, and creates a substantial and unreasonable risk of death or personal injury.

4.     For instance, in Lubbock, Texas in August 2012, one man was left dead and another seriously injured when a lightning strike punctured the CSST in his house, instigating a natural gas-fueled fire.  Fire and smoke damage affected the entire structure.

5.     It is well documented that CSST can fail catastrophically in the presence of lightning.  *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011),                              *available*                              *at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf.  When the gas line becomes energized, the energy from the lightning strike passes through it in search of a path to ground.  As it seeks a path to ground, the energy from the lightning strike will jump off the CSST, usually through the air to another nearby conductive material, in what is known as an arcing event.  The temperature generated by this lightning-induced event is measured in thousands of degrees, which is easily hot enough to melt and penetrate through the thin skin of the CSST, even though the arcs last only a fraction of a second.  When the gas line melts, gas inside is allowed to escape and is ignited by the melting event, causing a gas-fueled fire.

6.     In fact, a 2005 expert report prepared by Mark Goodson, a specialist in electrical and mechanical failure analysis, concluded: "CSST fails when the CSST is contacted by

2

electrical current associated with lightning.  Due to its uniform design (in accordance with ANSI LC-1), all CSST fails in the same manner when damaged by lightning: electricity contacts the CSST, the CSST acts as a conduit for the electrical current, the electricity perforates the pipe and permits gas to escape.  Often, this same arcing process will cause ignition of the escaping gas. This problem uniformly affects all CSST brands, in that the products have the same inherent design, thickness (or lack thereof) and physical properties."   Mark Goodson and Mark Hergenrether, *"The Causal Link Between Lightning Strikes, CSST, And Fire,"* Fire and Arson Investigator   (October   2005),   available   at   http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf

7.   Despite this knowledge, Defendant has advertised and continues to advertise that Gastite is safe, reliable and cost-effective.

8.   Despite Defendant's advertisements and representations to the contrary, Gastite was improperly designed and manufactured.  Gastite's defects put Plaintiff and Class Members' houses at serious risk for CSST damage when insulted by lightning.

9.   Titeflex has known for many years that Gastite is vulnerable to lightning strikes and subsequent property damage.  Titeflex, however, concealed this and failed to inform all houseowners, contractors, and consumers that its CSST can cause injury and property damage if their structures are struck by lightning.

10.   The presence of Gastite in Plaintiff and Class Members' structures poses an unreasonable risk of fire due to lightning strikes.

## THE PARTIES

11.     Plaintiff David Eastman ("Eastman") is the owner of a house located in Comal County, Texas with Gastite presently in his house.  At all times material, Mr. Eastman was a resident and citizen of the State of Texas.  Plaintiff's Gastite was purchased in 2004.

12.     Plaintiff, on behalf of himself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of all residential and commercial structures with Gastite.  Gastite is defective, should never have been sold, and needs to be removed and replaced from all structures.

13.     Defendant Titeflex Corporation is a Connecticut corporation, with a principal place of business located at 603 Hendee Street, Springfield, Massachusetts.  At all relevant times, Titeflex was engaged in the business of designing, manufacturing, distributing, testing, and selling CSST under the product name Gastite used for the distribution of natural gas in residential properties.  Titeflex is a subsidiary of Smiths Group plc under the Flex-Tek Division. Smiths Group is a global technology company listed on the London Stock Exchange.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction), in that (i) there is complete diversity (Plaintiff is a citizen of Texas and Defendant is incorporated in Connecticut, and to the extent pertinent, maintains its principal place of business in Massachusetts, (ii) the amount in controversy exceeds $5,000,000.00 (Five-Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

15.     Venue lies in this District, pursuant to 28 U.S.C. § 1391, because Plaintiff resides in this Judicial District, and a substantial part of the events or omissions giving rise to Plaintiff's

claims occurred in this Judicial District.  In addition, Defendant does business and/or transacts business in this Judicial District, and therefore is subject to personal jurisdiction in this Judicial District and resides here for venue purposes.

**FACTUAL BACKGROUND OF CSST**

16.     CSST was initially developed during the early 1980's as a safe and effective gas distribution system that can withstand damages that can occur during earthquakes and other natural disasters.

17.     Gastite consists of flexible polyethylene metal pipe that fits between the building gas source and appliances, as well as fittings and other accessories.  The flexibility of the tube allows it to be routed through the building in continuous lengths without the many joints required with rigid piping and without the need for any special tools.  The flexible gas piping market in the United States is currently concentrated in the residential housing market.

18.     There are approximately ten manufacturers of flexible metal hose in the United States.  The U.S. manufacturers include Titeflex Corporation, Ward Manufacturing, Truflex, Microflex, U.S. Hose, Hose Master, Omega Flex Inc., and several smaller privately held companies.

19.     CSST is made from 300 series stainless steel and is more expensive than an equivalent length of iron pipe.

20.     According to industry experts, "CSST has revolutionized the gas-distribution business.  CSST is easy to use and this lowers the cost over the entire installation.  Back-breaking black iron pipe projects that demanded eight or 10 laborers can now be handled with ease by only one or two certified CSST installers – freeing up precious labor for other tasks that will keep your projects moving forward.  Lightweight and flexible Gastite CSST will typically

slash installation time by 50% or more." Mary Jo Martin, *In Less than Two Years, Gastite Establishes Strong Position in Market*," The Wholesaler (March 2009), available at http://www.thewholesaler.com/march_09/gastite_feature.php.

21.    The advantages of CSST over traditional black iron pipe also include lower overall installation costs because it can be installed in long uninterrupted lines within the building.

22.    As of March 2013, CSST commands slightly over one-half of the market for fuel gas piping in new and remodeled residential construction in the United States.  Rigid iron pipe, and to a lesser degree copper tubing, accounts for the remainder of the market.

DANGERS OF LIGHTNING AND CSST

23.    CSST is likely to fail when exposed to electrical insult, particularly lightning. *See* Mark Goodson and Mark Hergenrether, *"Lightning Induced CSST fires"* (August 2011), available    at    http://goodsonengineering.com/wp-content/uploads/2011/08/p379-Goodson-TB1140_web.pdf.  Gas piping systems are particularly susceptible to damage because they are a potential conductive path for lightning energy, and are likely to be routed near other metal utility lines inside the house.

24.    In an indirect lightning strike, a strike close to a structure or house generates a partial lightning current in the metal links of the building.  This electrical energy in attempting to reach ground may arc between metal systems that have different electrical resistance, and arcing can cause damage to the metal systems.

25.    Damage caused by a direct or indirect lightning strike to a CSST system can be described as a small puncture of the tubing wall.  This type of damage is caused by an arc of energy "jumping" from a pathway of higher potential to a pathway of lower potential in an effort

6

to find a lower impedance pathway to ground. A puncture in the tubing wall can ignite the natural gas at the hole. This gas can ignite surrounding materials and spread to create an extensive fire, resulting in significant damage to the house and destruction of almost all of the contents of the house. This type of damage appears to be consistent around the country.

26.   In standard CSST systems, an electrical bond between the CSST and the building's grounding electrode *can* address this issue. Bonding is the process of making an electrical connection between the grounding electrode and any equipment, appliance or metal conductor. Bonding of CSST to a common grounding electrode allows the energy to move at the same rate as the electrical system in unison with the energy wave. The requirement for bonding and grounding is very specific depending on the area's building codes. The provisions for grounding of the electrical system and bonding other metallic systems are contained in the National Electric Code (NEC NFPA 70) and the National Fuel Gas Code (NFGC NFPA 54).

27.   Even if all mechanical and electrical systems of the building are properly bonded, the risk of a CSST induced fire is still present.

28.   An expert on gas piping opined that "CSST manufacturers give installers and building inspectors way too much leash in expecting them to do their jobs right. Even when the job is 'done right,' there is still the opportunity for the CSST to become a conduit for lightning to ground. Many installers believe that connecting their CSST to an electrical panel with a bond wire is acceptable, but what most do not realize is that a lot of electrical panels are not properly grounded to terra firma." According to his professional opinion, "If you...leave CSST in your building, then you are gambling or are just plain stupid." John Rocheleau, *"CSST Gas Pipe/Lightning Fires,"* Protech HVAC (August 1, 2012), available at http://www.protechhvac.com/tag/csst/.

7

29.    In fact, Mark Goodson, an expert in electrical and mechanical failure analysis, recommended the following three remediations to prevent CSST induced fires, including complete removal of CSST from the structure: "(1) convert the structure to electricity only and remove all gas delivery; (2) *retain gas but remove all CSST from the structure and install black iron pipe,* or (3) prevent lightning from contacting the CSST which would prevent perforation and ensuing fire – i.e., install a NFPA 780 type lightning arrestor system (so called Ben Franklin system). Without paying for the costs associated with one of these three solutions, homes or structures containing the CSST are subject to fire due to the uniform failure when electrical current caused by lightning contacts the CSST." Mark Goodson and Mark Hergenrether, *"The Causal Link Between Lightning Strikes, CSST, And Fire,"* Fire and Arson Investigator (October 2005), available at http://goodsonengineering.com/wp-content/uploads/2011/08/InvestigatingtheCasualLinkBetweenLightningStrikesCSSTFire.pdf (emphasis added).

30.    The dangers resulting from CSST and lightning strikes have resulted in the Frisco, Texas Fire Department and the Arlington, Texas Fire Department seeking to ban CSST. As of August 2011, 141 fires involving lightning and CSST have been reported throughout the United States. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage,* The Fire Protection Research Foundation (April 2011), *available at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20Report.pdf.

## TITEFLEX'S GASTITE REPRESENTATIONS

31.     Gastite is manufactured in a facility in Portland, Tennessee.  Gastite's website states "Gastite has been a pioneer in fuel gas piping for more than twenty years and continues to set the standard in the industry with product innovations, superior technical support, and world-class customer service."

32.     Gastite's website (*see* www.gastite.com) further states:

> the system is a safe, time-saving and efficient method of installing piping for natural gas and liquefied propane gas. It utilizes corrugated, semi-rigid stainless steel tubing (CSST) with polyethylene jacketing and fully integrated, all-metal components. We offer a comprehensive system of fittings and accessories from our patented XR2 Series Fitting, to our exclusive modular stub system, to our regulators, mounting hardware and protection devices. Gastite also has available a complete line of polyethylene tubing and accessories for direct burial applications. Our products offer contractors and design engineers one-stop shopping for all their fuel gas-piping needs. This is why we say that at Gastite, the system is the solution.

> ...

> Gastite – The Flexible Alternative.

> ...

> Now the most difficult piping jobs can be accomplished with ease and speed.

> ...

> The Gastite system is listed by several independent third party laboratories and is recognized by model building codes throughout North America.

> ...

> Gastite is a reliable, cost-effective system that can be installed in all modes of construction: residential, commercial and industrial; new construction and retrofits.

## TITEFLEX KNEW GASTITE WAS DEFECTIVE AND FAILED
## TO ADEQUATELY TEST GASTITE

33.     Upon information and belief, Gastite was not designed to withstand the massive and unpredictable energy associated with an indirect lightning strike.  Its intended use was to distribute propane and natural gas to appliances within a building, and not function as a lightning rod or a lightning protection system.

34.     As cited herein, numerous studies and reports have continued to put Titeflex on notice that problems exist with CSST.

35.     Despite this knowledge, Titeflex failed to sufficiently warn Plaintiff and the Class or their contractor or subcontractors of the unreasonable risk of failure of the CSST when subjected to energy from an indirect lightning strike.

36.     An April 2011 study conducted by SEFTIM addresses the CSST failure scenario and suggests the need for significant testing in an effort to "mitigate" lightning related damage. *See* SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), *available                                                                          at* http://www.nfpa.org/assets/files/PDF/Research/CSST%20Gas%20Piping%20Ph.1%20Final%20 Report.pdf (the "Report").   The Report was issued by the Fire Protection Research Foundation, a group that consists of members of NFPA, the National Electrical Contractors Association, the U.S. Army, the New Mexico Institute of Technology, and three private engineering firms, among others. Significantly, the sponsors of the study included numerous CSST manufacturers.   The Report charges CSST manufacturers with the need to conduct numerous tests in an effort to reduce the hazards of the product.

37.    The Report provides numerous examples of CSST failure scenarios and attempts to offer solutions, which it also calls "mitigations," to address future CSST failure scenarios. The Report cautions that merely bonding the CSST at its starting and/or ending point may not be sufficient and that "a global equipotential solution is necessary to achieve a complete solution." The "mitigations" would include the following possibilities if supported by testing: multiple bonding, bonding with a short length of conductor, requiring minimum bends, requiring a separation distance from another metallic circuit (such as a chimney flue or cable), and a design change that would enhance the ability to withstand a lightning surge.  The Report notes that some manufacturers already include some of these requirements in their prior "installation rules." But the Report cautions: "However, based on some studied CSST cases, holes do not always occur where the distance between the CSST and a metallic part is the smallest, and thus separation distance may be difficult to address." It also cautions that none of these potential solutions may actually work: testing is still needed to show that they will, in fact, work.

38.    According to the Report, several tests of CSST have yet to be carried out.  The recommended testing is summarized in the Conclusion section, as follows:

a.    "Simulations are needed to show if separation distance is needed based on bonding conductor length and possible lightning currents given from the standard database. Bonding conductors located at the entrance may not be enough if the bonding conductors are too long. In that case, multiple bonding or separation distance may solve the problem (please note that a few cases have shown that incidents occurred in spite of apparent sufficient separation distance)."

b.    "Tests should be made to check the ability of CSST to withstand small fault current for a long time, as well as higher fault current for a shorter time. It should be confirmed that multiple bonding is unlikely to create a major problem when surge current is flowing along CSST."

c.    "Tests should be performed to identify the impedance (mainly inductance) of CSST per unit measure."

11

d. "Tests to determine CSST impedance should incorporate the maximum bending radius as given in technical brochures. The effect of bends should be investigated."

e. "Tests should be performed with 8/20 impulses (representing induced surges) to see if this can damage CSST if multiple bonding is not provided."

These needed tests and simulations would allow CSST manufacturers to adequately determine if multiple bonding is necessary or not.

39.     Ignoring commonly available reports and notices, and upon information and belief, Titeflex failed to test and understand Gastite's overall ability and safety. Adequate testing would have revealed the serious deficiencies in Gastite in that it would have solidified the knowledge of the link between Gastite and natural gas fires resulting from lightning strikes.

## LITIGATION INVOLVING TITEFLEX

40.     In 2004, a class-action lawsuit, *Lovelis, et al. v. Titeflex, et al.*, Case No. Civ-2004-211 (Arkansas Circuit Court, Clark County) was filed in Arkansas against several CSST manufacturers, including Titeflex. The suit claimed CSST posed an unreasonable risk of fire from lightning strikes -- leading to a 2006 settlement. The defendants denied these allegations, and denied any wrongdoing or legal liability, but agreed to settle this matter to avoid further cost and the uncertainty and risk of the outcome of further litigation. Under the Settlement Agreement, Titeflex and others agreed to pay the value of each payment voucher redeemed by a class member for the installation of a lightning protection system or bonding and grounding of the company's CSST product. The settlement class involved "all persons and/or entities who own real property or structures in the United States in which CSST manufactured by the Settling Defendants was installed as of September 5, 2006." It is unknown how many class members received this notice.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this class action pursuant to F.R.C.P. 23 on behalf of himself and a Class defined as follows:

> All persons in the State of Texas who own a house, or other structure, in which Titeflex's Gastite is installed.

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Titeflex and any entity in which Titeflex has a controlling interest or which has a controlling interest in Titeflex and its legal representatives, assigns and successors of Titeflex; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

42.     *Numerosity:* The Class is composed of thousands of persons in the State of Texas, the joinder of whom in one action is impractical.  Between 2000 and the present, thousands of homes in Texas, perhaps tens of thousands, were constructed with CSST.   Titeflex has approximately 10% share of the CSST market.  It follows that thousands of homes in Texas were built and equipped with Gastite.   Moreover, upon information and belief, the Class is ascertainable and identifiable from Titeflex's records or identifying marks on the CSST.

43.     *Commonality:* Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual issues include the following:

   a.   Whether Gastite is inherently defective;

   b.   Whether Gastite was in an unreasonably dangerous condition when it was manufactured and distributed;

   c.   Whether Gastite was reasonably safe for its intended use as manufactured and designed;

   d.   Whether Titeflex knew or should have known of the defect;

13

e. Whether Titeflex concealed from consumers and/or failed to disclose to consumers the defect;

f. Whether Titeflex failed to provide adequate installation instructions;

g. Whether Titeflex failed to adequately test for potential defects in Gastite;

h. Whether Titeflex failed to adequately warn of the foreseeable risks associated with using Gastite;

i. Whether Titeflex omitted critical information regarding defects in its product in its marketing, sales and installation materials;

j. Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement of Gastite and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between Gastite as warranted and Gastite containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in Gastite;

k. Whether Plaintiff and the Class are entitled to all costs associated with replacement of their defective Gastite with non-defective CSST; and

l. Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

44. *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Titeflex's conduct in designing, manufacturing, marketing, advertising and selling the defective Gastite and Titeflex's conduct in concealing the defect in the Gastite to owners, contractors, developers, and suppliers.

45. *Adequate Representation:* Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability (specifically concerning home piping systems) and product design defects.

46. *Predominance and Superiority:* This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over

questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class members be required to bring separate actions, this Court and courts throughout Texas would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## COUNT I
### Strict Liability – Design and Manufacturing Defect

47.     The allegations contained in the paragraphs above are incorporated herein by reference as if fully set forth.

48.     At all times relevant hereto, Titeflex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping, including the Gastite CSST piping installed at Plaintiff and Class Members' houses.

49.     At all times relevant hereto, Gastite was designed and placed into the stream of commerce by Titeflex.

50.     Titeflex designed, formulated, tested, manufactured, inspected, marketed, distributed, supplied and/or sold Gastite that was defective in design and/or manufacture when the product left the hands of the Defendant. The foreseeable risk from installing Gastite exceeded any potential benefits associated with the design and/or manufacture of it.

15

51.     Gastite manufactured by Titeflex was expected to and did reach Plaintiff and Class Members' houses without substantial change in the condition in which it was designed, manufactured, tested, inspected, distributed, marketed or sold.

52.     Ultimately, Gastite designed, formulated, tested, manufactured, inspected, distributed, stored, marketed, supplied and/or sold by Titeflex was defective in design and/or manufacture in that, when the product left the hands of the designers, manufacturers, distributors and/or suppliers, it was unreasonably dangerous, more dangerous than a houseowner would expect.

53.     Titeflex knew, or should have known, that at all times mentioned herein, Gastite was inherently dangerous and unsafe because of its inability to adequately resist lightning strikes.

54.     Plaintiff and the Class, acting as reasonably prudent people, could not discover that Gastite was defective as mentioned herein, or perceive its danger.

55.     At the time of use of Titeflex's Gastite, Plaintiff and the Class utilized the piping for the purposes and manner normally intended.

56.     By reason of the foregoing, Titeflex is strictly liable in tort to Plaintiff and the Class for designing, manufacturing, testing, inspecting, distributing, marketing and/or selling Gastite.

57.     Said defects in Gastite were a substantial factor in causing Plaintiff and the Class damages and injuries and/or placing Plaintiff and the Class members at increased risk of damage and/or harm.

58.     As a direct, proximate, and foreseeable result of the defective condition of Gastite as manufactured and sold by Titeflex, and pursuant to Section 402A of the Restatement (Second) of Torts, Plaintiff and the Class have suffered, and will continue to suffer, damages.

## COUNT II
### Negligence – Design Defect: Failure to Test

59.     The allegations contained in the paragraphs above are incorporated herein by reference as if fully set forth.

60.     Titeflex did not perform adequate testing on Gastite that was defectively designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold to Plaintiff and the Class.

61.     Adequate testing would have revealed the serious deficiencies in the Defendant's Gastite in that it would have solidified the knowledge of the link between Gastite and natural gas fires resulting from lightning strikes.

62.     Titeflex had and continues to have a duty to exercise reasonable care to properly design, including the duty to test, its Gastite that it introduced into the stream of commerce, including a duty to ensure that Gastite does not cause its users, including the Plaintiff and Class, to suffer from unreasonably dangerous results as a result of using it.

63.     Titeflex breached these duties by failing to exercise ordinary care in the design, specifically the testing of Gastite, which it introduced into the stream of commerce, because Titeflex knew or should have known that Gastite created an unreasonable risk of fire and danger, and failed to do the appropriate testing.

64.     Titeflex knew or should have known that consumers such as Plaintiff would foreseeably suffer economic damages or injury, and/or be at an increased risk of suffering damage and injury, as a result of its failure to exercise ordinary care in the design of the product by failing to do the appropriate testing.

65.     By reason of the foregoing, Plaintiff and the Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as financial damage and injury.

66.    As a direct and proximate result of the Defendant's failure to test Gastite designed, formulated, manufactured, inspected, distributed, marketed, warranted, advertised, supplied and/or sold by the Defendant, Plaintiff and the Class has suffered damages.

## COUNT III
### Negligence – Failure to Warn

67.    The allegations contained in the paragraphs above are incorporated herein by reference as if fully set forth.

68.    At all times mentioned herein, Titeflex designed, formulated, tested, manufactured, inspected, distributed, marketed, supplied and/or sold Gastite to Plaintiff and the Class.

69.    At all times material hereto, the use of Gastite in a manner that was intended and/or reasonably foreseeable by Titeflex involved substantial danger that would not be readily recognized by an ordinary user of Gastite.

70.    At all times material hereto, this danger was known or knowable by the Titeflex, in light of the generally recognized and prevailing knowledge available at the time of manufacture and design, as described herein.

71.    Titeflex, as the manufacturer of Gastite, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use.

72.    Titeflex was negligent and breached its duty of care by negligently failing to give adequate warnings to purchasers and users of Gastite, including Plaintiff, about the unreasonably dangerous and defective condition of Gastite, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury Gastite creates.

18

73.     Titeflex failed to exercise reasonable care in their design, marketing, and sales so as to inform Plaintiff and the Class the dangers inherent associated with using Gastite in their structures. Titeflex failed to adequately warn Plaintiff of any dangers.

74.     Titeflex knew, or by the exercise of reasonable care, should have known of the inherent design defects and resulting dangers associated with using Gastite and knew that Plaintiff and/or the Class could not reasonably ascertain these dangers.   Notwithstanding, Titeflex failed to exercise reasonable care in providing consumers with adequate warnings.

75.     Despite the fact that Titeflex knew or should have known that Gastite was associated with and/or could cause natural-gas fed fires and creates a substantial and unreasonable risk of death or personal injury, Titeflex continued to market, manufacture, distribute and/or sell Gastite to consumers, including Plaintiff and the Class.

76.     As a direct and proximate result of Titeflex's failure to adequately warn consumers of the dangerous properties of using Gastite in their structures, Plaintiff and the Class have suffered damages as set out herein.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of himself and all other persons and entities similarly situated, prays for a judgment against Titeflex as follows:

1.      For an order certifying the Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.      For compensatory damages sustained by Plaintiff and the Class;

3.      An award of costs as allowed by law;

4.      For both pre-judgment and post-judgment interest on any amounts awarded;

5.      For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

6.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

June 6, 2013

/s/ Sam Lock
Sam Lock

LAW OFFICES OF SAM LOCK
Sam Lock (Attorney-In-Charge, State Bar No.
24000470, Federal Bar No. 1054191)
1011 S. Alamo
San Antonio, TX 78210
Telephone: (210) 226-0965
Facsimile: (210) 226-7540
sam@locklawfirm.com

Charles J. LaDuca
Brendan S. Thompson
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Gary E. Mason
Monica Bansal
WHITFIELD BRYSON & MASON LLP
1625 Massachusetts Ave., NW, Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

Daniel K. Bryson
WHITFIELD BRYSON & MASON LLP
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5002

20

Facsimile: (919) 600-5035

D. Aaron Rihn
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Pittsburgh, PA 15219
Telephone: (866) 273-1941
Facsimile: (412) 281-4229

Joseph S. Bellissimo, Esq.
BELLISSIMO & PEIRCE
120 Fourth Street
Ellwood City, PA 16117
Telephone: (724) 758-5544

Scott W. Weinstein
MORGAN & MORGAN, P.A.
12800 University Drive
Suite 600
Fort Myers, FL 33907
Telephone: (239) 432-6666
Facsimile: (239) 822-8830

Michael McShane
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900